IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOSHUA JAMES CAPO, § | |
| (TDCJ-CID #1567259) § | |
| § | |
| Petitioner, § | |
| § | |
| VS. § | CIVIL ACTION NO. H-10-2123 |
| § | |
| RICK THALER, § | |
| § | |
| Respondent. § | |

**MEMORANDUM AND OPINION**

The petitioner, Joshua James Capo, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a 2010 disciplinary conviction at the Ferguson Unit of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ-CID"). Capo is currently serving a sentence for a 2009 conviction imposed by a state court in Johnson County, Texas. The respondent has filed a motion for summary judgment, (Docket Entry No. 9), along with prison disciplinary and grievance records. (Docket Entry No. 10). Capo has filed a memorandum in support of his federal petition, (Docket Entry No. 3), and a response to the respondent's motion. (Docket Entry No. 11). Based on careful consideration of the pleadings, the motion and response, the record, and the applicable law, this court grants the respondent's motion and, by separate order, enters final judgment. The reasons are explained below.

**I.    Background**

In support of the motion for summary judgment, the respondent provides the following documents:

(A) TDCJ-CID computer records relating to Capo's conviction;

(B) records from TDCJ on the disciplinary case at issue, Case Number 20100133970, with a supporting affidavit;

(C) records relating to Capo's grievances about the disciplinary hearing, with a supporting affidavit;

(D) excerpts from the TDCJ Disciplinary Rules and Procedures for Offenders; and

(E) an audio recording of the hearing in disciplinary Case Number 20100133970.

(Docket Entry No. 10).

The summary judgment evidence shows that on January 10, 2010, Officer Smith charged Capo with participating in a riot with black, white, and Hispanic inmates. Smith stated that he had seen black and white inmates fight with Hispanic inmates. Smith yelled "fight" and "riot" to summon officers to help control the situation. The charge stated that the riot created a danger of injury to the inmates and obstructed the performance of regular unit operations because all staff had to respond. (Docket Entry No. 9, Disciplinary Hearing Record, p. 1). Capo received notice of the charge at 6:50 a.m. on January 10. (*Id.* at 1). Capo was advised of his right to call witnesses; to present documentary evidence; to be represented by a counsel substitute; and to question the charging officer at the hearing. Counsel-substitute Leveston was appointed to represent Capo. Leveston interviewed Capo on January 15, 2010. Capo told Leveston that he had gone to eat and was the first to return to the day room. According to Capo, when other inmates began rioting, he went to the door to try to leave the day room. Capo explained that not all of the inmates in the day room were participating in the riot. Capo stated that he wanted to call Major Brewer as a witness.

In her prehearing investigation, Leveston interviewed Officer Smith, the charging officer. (Docket Entry No. 9, Disciplinary Hearing Record, p. 4). Officer Smith told Leveston that all the inmates in the day room were fighting. Counsel substitute Leveston also spoke with Major Brewer, who stated that there were two separate disturbances. After the first disturbance, several inmates were removed from the day room. The second disturbance took place when the inmates who remained in the day room began fighting. (Docket Entry No. 10, Disciplinary Hearing Record, p. 9).

Captain Jennings conducted the disciplinary hearing on January 19, 2010. (*Id.* at 1). Counsel substitute Leveston represented Capo at the hearing. Capo was present during the entire hearing. (*Id.* at 1).

This court has reviewed the audio recording of the disciplinary hearing. Capo stated that he was not involved in the riot. He simply happened to be in the day room when other inmates started fighting. Capo stated that he tried to leave the day room but officers locked the doors and told everyone to sit down. Counsel substitute introduced the statement by Major Brewer describing the two separate disturbances. Officer Olowoniyi testified that there were some offenders in the day room who were not participating in the riot but he could not identify Capo as one of those offenders. Officer Olowoniyi explained that several inmates were standing up and yelling, and he could not see everyone's faces clearly. Officer Smith testified that she saw all the inmates in the G-block day room participating in the fighting. Captain Jennings clarified with Officer Smith that Capo was involved in the first of the two disturbances. When asked if she specifically saw Capo participating in the riot, Officer Smith reiterated that she saw all the inmates participating. When asked if any inmates were sitting or trying to get out of the day room, Officer Smith testified that all the inmates

were standing and yelling and participating in the riot. Though she was unable to see each inmate's face, Officer Smith testified clearly that all the inmates in the day room were involved.

Lieutenant Laningham provided a written statement describing the incident. On January 10, 2010, at 4:25 p.m., he responded to a call for assistance at the G-block day room. From the corridor, Officer Laningham saw several inmates fighting. He did not see any inmates who were not participating in the fight. He could not identify the specific individuals involved but could tell that black inmates were fighting with Hispanic inmates and that some white inmates were insulting and struggling with other inmates.

In finding Capo guilty of the charged offense of engaging in a riot, a Level 1, Code 8.0 offense, the hearing officer, Captain Jennings, considered the disciplinary report, the charging officer's testimony, and Lieutenant Laningham's written statement. (Docket Entry No. 9, Disciplinary Hearing Record, p. 1). Capo's punishment consisted of a loss of commissary privileges for 45 days; cell restriction for 45 days; reduction in good-time earning class status from Line 1 to Line 3; and a loss of 365 days of good-time credit. On January 20, 2010, Capo filed a Step One Grievance, which was denied on February 19, 2010. (Docket Entry No. 10, Disciplinary Grievance Record, pp. 1-2). Capo filed a Step Two Grievance on February 24, 2010. On March 10, 2010, a modification was made to the offense code and the penalty. The offense was downgraded from engaging in a riot (Level 1, Code 8) to creating a disturbance (Level 2, Code 23.0). (*Id.* at 3-4). Part of the punishment was reduced, from a loss of 365 days of good-time credit to a loss of 45 days of good-time credit. (*Id.* at 4).

On June 14, 2010, this court received Capo's federal petition. Capo contends that his disciplinary conviction is void because the evidence was insufficient to support the finding of guilt.

He argues that he was never specifically identified as a participant in the riot and that his conviction was based only on the charging officer's statement that all the inmates in the day room were fighting. (Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 7-8).

## II. Analysis

### A. The Due Process Claim

In *Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974), the Supreme Court held that the standards governing disciplinary proceedings depend on the sanction imposed and the consequences. A prisoner punished by solitary confinement and loss of good-time credits is entitled to: (1) written notice of the charges against him at least 24 hours before the hearing; (2) a written statement of the fact finders as to the evidence relied on and the reasons for the disciplinary action taken; and (3) the opportunity to call witnesses and present documentary evidence in his defense, unless these procedures would create a security risk in the particular case. When the punishment has no effect on parole, such as a short period of administrative segregation, an inmate is entitled to notice and an opportunity to present a statement in an informal nonadversary evidentiary review. *Hewitt v. Helms*, 459 U.S. 460 (1983); *Walker v. Navarro Cnty. Jail,* 4 F.3d 410, 412 (5th Cir. 1993). In *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court held that if a disciplinary conviction and punishment affect state-created liberty interests, there must be certain procedural safeguards to satisfy due process. Such interests are generally limited to state-created regulations or statutes that affect the quantity, rather than the quality, of time a prisoner serves. The Due Process Clause does not protect against every change in the conditions of confinement that has a substantial adverse effect upon a prisoner. *Id.* at 478. If state laws mandate sentence reductions for good-time, and a prisoner is punished for a disciplinary conviction by losing good-time credits and as a result his sentence is

increased, he is entitled to those procedural safeguards. *Madison v. Parker*, 104 F.3d 765, 768 (5th Cir. 1997).

Capo's modified punishment consisted of a loss of commissary privileges for 45 days; cell restriction for 45 days; reduction in good-time earning class status from state approved Trusty 1 to Line 3; and a loss of 45 days of good-time credit. Capo cannot assert a due process claim based on the loss of commissary privileges or his cell restriction. Neither of these punishments inevitably affect the duration of his sentence. Nor are they the type of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 486 n.9. The punishment changed the conditions of Capo's confinement, but do not require the procedural protections set out in *Wolff* and *Hewitt*.

Capo cannot complain that the reduction in his good-time earning class status created a due process violation. Prisoners may become eligible for release under Texas law on parole or under a mandatory supervised release program. *See Madison*, 104 F.3d at 768. "Parole" is the "discretionary and conditional release of an eligible prisoner . . . [who] may serve the remainder of his sentence under the supervision and control of the pardons and paroles division." *Id.* "Mandatory supervision" is the "release of an eligible prisoner . . . so that the prisoner may serve the remainder of his sentence not on parole, but under the supervision and control of the pardons and paroles division." *Id.* Capo cannot assert a claim based on the possibility that his release on parole could be delayed. The law is clear that Capo has no constitutional right to parole and no liberty interest in obtaining parole under Texas law. *Orellana v. Kyle*, 65 F.3d 29, 32 (5th Cir. 1995); *Madison*, 104 F.3d at 768 (citing TEX. CODE CRIM. P. ANN. art. 42.18, § 8(a)). As a result, he has no due process claim.

Capo may argue that if he had remained at the good-time earning status of S1 rather than Line 3, he would have had an opportunity to earn good-time credits that might have led to an earlier release on parole. Such argument mistakenly equates the ability to earn good time credits with the actual loss of such credits. Capo did not lose accrued or earned good-conduct time as a result of the reduction in earning-class status. Rather, his ability to earn good-time credits was curtailed. Capo's diminished ability to earn good-time credits, without more, did not deprive him of a protected liberty interest. *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995), *cert. denied*, 517 U.S. 1196 (1996)("the mere opportunity to earn good-time credits" does not constitute a "constitutionally cognizable liberty interest sufficient to trigger the protection of the due process clause"). The possibility that an inmate's good-time earning status will affect the timing of his release is considered too speculative to create constitutionally protected liberty interest. *Id.*

Capo also complains that the loss of 45 days of good-time credit will delay his release to mandatory supervision. Capo is eligible for release to mandatory supervision for his sentence for burglary of a habitation. (Docket Entry No. 1, Federal Petition, p. 2). When, as here, a State creates a right to good-time credit and recognizes that its revocation is an authorized sanction for misconduct, "a prisoner's interest therein is embraced within the Fourteenth Amendment 'liberty' concerns so as to entitle him to those minimum procedures appropriate under the circumstances and required by the due process clause to insure that this state-created right is not arbitrarily abrogated." *Madison*, 104 F.3d at 768 (citing *Wolff*, 418 U.S. at 557). Capo is eligible for mandatory supervision under the applicable Texas law, which gave him a protected liberty interest in his previously earned good-time credits. *See Teague v. Quarterman,* 482 F.3d 769, 775-76 (5th Cir. 2007) (citing *Malchi v. Thaler,* 211 F.3d 953, 956 (5th Cir. 2000)).

In Texas, release on mandatory supervision is "the release of an eligible inmate sentenced to the institutional division so that the inmate may serve the remainder of the inmate's sentence not on parole but under the supervision of the pardons and paroles division." TEX. GOV'T CODE § 508.001(5). This early-release provision is termed "mandatory" because under the law in effect before September 1, 1996, once a prisoner's actual time served plus his accrued good-time credit equaled his prison sentence, he had a nondiscretionary right to release "based solely on simple arithmetic." *Teague v. Quarterman*, 482 F.3d 769, 775 (5th Cir. 2007). After Texas amended the mandatory-supervision scheme, after September 1, 1996 scheme, the parole panel has some discretion to deny release if it determines that "(1) the inmate's accrued good conduct time is not an accurate reflection of the inmate's potential for rehabilitation; and (2) the inmate's release would endanger the public." TEX. GOV'T CODE § 508.149(b). The Fifth Circuit has described this new scheme as "mandatory in large part, but also discretionary in small part." *Teague*, 482 F.3d at 775. Both the Fifth Circuit and the Texas courts have held that the post-September 1, 1996 mandatory provision scheme does create a protected liberty interest. *Teague v. Quarterman*, 482 F.3d 769, 777 (5th Cir. 2007); *Ex parte Geiken*, 28 S.W.3d 553, 558 (Tex. Crim. App. 2000). Because Capo had a liberty interest in good-time credit accrued toward his potential early release on mandatory supervision, the revocation of those credits must comply with due process. *See Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985); *Henson v. U.S. Bureau of Prisons*, 213 F.3d 897, 898 (5th Cir. 2000). The issue is whether Capo received the process he was due.

The record shows that Capo had notice of the charges and the opportunity to make a statement at the hearing. Capo was able to question the charging officer, who testified at the hearing. The record reflects that counsel substitute investigated and presented the results of that investigation

at the disciplinary hearing. Capo received a written statement by the fact finder of the evidence and the reason for the disciplinary action. Capo has not shown a due process violation that would support the relief he seeks. *See Wolff,* 418 U.S. at 563-66.

### B. The Insufficiency of the Evidence Claim

In *Superintendent v. Hill*, 472 U.S. 445, 455 (1985), the Supreme Court held that revocation of good time does not comport with "the minimum requirements of procedural due process," unless the findings of the prison disciplinary board are supported by some evidence in the record. *Id.* at 454. As the Supreme Court has explained:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credits is not comparable to a criminal conviction, and neither the amount of evidence necessary to support such a conviction, nor any other standard greater than some evidence applies in this context.

*Superintendent,* at 455-56; *accord Sweeney v. Parke,* 113 F.3d 716, 720 (7th Cir. 1997); *Gibbs v. King,* 779 F.2d 1040, 1044 (5th Cir.), *cert. denied,* 476 U.S. 1117 (1986). In reviewing prison disciplinary findings under federal habeas corpus, "the standard to be applied is whether or not actions of the disciplinary committee were arbitrary and capricious or an abuse of discretion." *Id.* De novo review of the disciplinary board's factual finding is not required. A court must consider

whether at least the decision is supported by some evidence. (citation omitted). "Prison disciplinary proceedings are overturned only where no evidence in the record supports the decision." *Broussard v. Johnson*, 253 F.3d 874, 877 (5th Cir. 2001); *see also Superintendent, Mass. Corr. Inst.*, 472 U.S. at 455-456 ("[T]he relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."); *Morgan v. Dretke*, 433 F.3d 455, 456 (5th Cir. 2005) ( "The 'some evidence' standard is extremely deferential - we have found a single report or testifying witness sufficient to support an adverse disciplinary decision.").

Applying this standard defeats Capo's complaint of insufficient evidence. Capo asserts that he never participated in the riot in the G-block day room on the afternoon of January 10, 2010. Capo admits that he was in the day room. The disciplinary record shows that Officer Smith, the charging officer, saw all the inmates in the day room fighting. She testified that she did not see any inmates who were not participating in the riot. Lieutenant Laningham presented a written statement to the same effect. Sergeant Monckton provided a written statement describing the situation in the G-block day room when he responded to a radio call for assistance:

> I arrived to see approx. 6 Hispanic offenders siting [sic] in the hallway with cuts and scratches consistent to those of someone that had been in a fight. As I entered the G-block day room I noticed that all of the Black offenders and White offenders where [sic] on one side (the south side) and the Hispanic offenders where [sic] on the other side (the north side). After the incident in the hallway where the six Hispanic offenders jumped a black offender that was pushing the mop bucket off of the block. All of the Black and White offenders where [sic] standing up in the dayroom and moving towards the Hispanic offenders in the dayroom. The Black and White offenders where [sic] yelling back and forth at the Hispanic offenders. Who where [sic] also yelling at the Black and White offenders. The Black and White offenders where [sic] moving closer and closer towards the Hispanic offenders and the Hispanic offenders where [sic] backed up to the wall yelling "what you going to do about it". I then reentered the

> dayroom and stepped between them, and ordered them to sit back down. After a few orders the Black and White offenders did sit back down. Major Brewer stood at the dayroom door and instructed me to step out of the dayroom. The offenders where [sic] instructed by Major Brewer that if they got up again chemical agents would be utilized. The offenders began to calm down and remain in their seats. We then began to empty the dayroom starting with the Hispanics. Once all of the offenders where [sic] identified and secured I returned to my regular duties.

(Docket Entry No. 10, Disciplinary Hearing Record, p. 8).

Capo's principal argument is that none of the officers ever identified him as a participant in the riot and that the charging officer concluded that he was part of the riot because he was in the day room at the time. (Docket Entry No. 3, Petitioner's Memorandum, p. 3; Docket Entry No. 11, Petitioner's Response, p. 1). The record defeats this argument. The conviction was based on evidence that every inmate in the day room as involved in the riot. In *Perry v. Dretke,* 86 F. App'x 769, 2004 WL 256543 (5th Cir. 2004), the Fifth Circuit rejected a similar argument:

> The record does not clearly identify the source of the charging officer's statement or Sergeant Sargent's statement that Perry was a participant in the riot. It is possible, as the district court concluded, that the sole source for the charges against Perry was medical personnel's identification of Perry as an inmate who received treatment for injuries suffered during the riot. The specificity of the charging officer's charge, noting that Perry and two other named inmates were aggressors in the riot and that Perry damaged property during the riot, makes this scenario questionable, however. The record also does not indicate that the charging officer actually witnessed the alleged incidents. Still, it is only supposition that this information was based upon information from someone else, and there is no indication that the information was obtained from a confidential informant, which was the basis of information for the disciplinary charge in *Broussard.*
>
> Thus, although it is unclear whether the record contains direct evidence identifying Perry as a riot participant, "the record is not so devoid of evidence that the findings of the disciplinary board were

> without support or otherwise arbitrary." *See Hill,* 472 U.S. at 457, 105 S. Ct. 2768. As there was "some evidence" in the record that could support the disciplinary hearing officer's findings, the district court's judgment is REVERSED and this case is REMANDED for entry of judgment in favor of the respondent.

*Perry,* 86 F. App'x 769, 769-770.

As in *Perry,* there is no direct evidence that Capo participated in the riot in the G-block day room. Capo does not dispute that he was in the day room. Both Officer Smith and Lieutenant Laningham testified that all of the inmates in the day room were fighting. Because Capo was in the day room, the disciplinary hearing officer determined that he participated in the disturbance. The offense was later modified to reflect that Capo participated in creating a disturbance rather than in a riot.

Capo relies on *Zavaro v. Coughlin,* 970 F.2d 1148, 1148-49 (2nd Cir. 1992). That habeas case involved a prison riot in a mess hall. Inmates assaulted officers with fists and makeshift weapons. The petitioner, Frank Zavaro, was present in the mess hall at the time. Later that day, an Inmate Misbehavior Report was written up charging him with conduct that was violent or involved the threat of violence. The offense report stated:

> A riot situation erupted in the North Messhall. This incident included numerous assaults on staff by participants. The assaults included use of weapons, throwing of objects (trays, water pitchers, dishes, etc.) and striking with fists. Subject inmate was identified as being in the messhall during this riot. Employees on the scene verified that all inmates in the messhall were actively participating in this riot. This situation necessitated the discharge of chemical agents to regain control. Upon discharge, several inmates did flee the area. Those remaining were placed in a prone position on the floor. Identification of subject inmate was by departmental I.D. card and during the chemical agent decontamination process.

*Id.* at 1149. In determining whether "some evidence" existed to support the subsequent disciplinary conviction, the Zavaro court compared the record to that involved in *Superintendent v. Hill,* 472 U.S. at 447-48, 456. In that case, a prison guard heard commotion in a walkway. On investigating, he discovered an inmate with a swollen eye and a bleeding mouth and saw three inmates fleeing down the walkway. There were no others in the enclosed area.. The guard concluded that the three inmates had acted as a group in assaulting the victim, and so testified at their disciplinary hearings. The inmates were found guilty of violating prison regulations. *Id.* at 448. On those facts, the Supreme Court held that even though the evidence was "meager," it was sufficient to uphold the convictions. *Id.* at 457. The Second Circuit in *Zavaro* looked at the facts in *Hill* and concluded as follows:

> The "meager" evidence in *Hill* looks overwhelming in comparison to the evidence against Zavaro. Whereas the *Hill* inmates were observed in an enclosed walkway, Zavaro was observed in a large mess hall. In comparison to the three inmates in *Hill,* Zavaro was in a room with at least one hundred inmates. The *Hill* inmates fled; Zavaro waited and lay on the floor as instructed.
>
> Were the number of inmates far fewer and the enclosed area far smaller, then perhaps witnesses' statements that "every inmate" participated in the riot would constitute "some evidence" of a particular inmate's guilt, within the meaning of *Hill.* However, such all-inclusive statements about the conduct of one hundred or so inmates in a mess hall - especially coming from guards who were at the time being assaulted - are so blatantly implausible when taken literally that they do not constitute even "some evidence" of a particular inmate's guilt. The guards' sweeping statements can only be understood to mean that the guards observed very widespread participation in the riot, not that every one of the hundred or so inmates, without exception, took part.
>
> The guards' statements, then, did nothing more than place Zavaro in the mess hall at the time of a riot with widespread participation. They offered nothing to point to Zavaro as a participant, or to call into

> question his assertion that he remained at his table, without throwing anything - or even having a tray to throw - or assaulting anybody or even rising from his chair, until ordered to lie down on the floor. We find that the evidence in the record failed to meet the "some evidence" standard established by the Supreme Court in *Hill*, and that Homrighouse's determination that Zavaro participated in the riot, and the consequent punishment of Zavaro, violated Zavaro's rights under the Due Process Clause of the Fourteenth Amendment.

*Zavaro*, 970 F.2d at 1152-53.

Unlike *Zavaro*, where the riot took place in a messhall filled with a hundred inmates, the riot in the instant case took place within the much smaller confines of a day room. While not specified in the disciplinary record, it appears that the number of inmates in the day room was far less than the one hundred inmates involved in the riot in *Zavaro*. Additionally, unlike the guards in *Zavaro*, the guards in the instant case were not being assaulted by several inmates as they observed the scene. Officer Smith and Lieutenant Lanningham testified that they saw all the inmates in the day room participating in the riot. Because the number of inmates was far fewer and the enclosed area was far smaller than that described in *Zavaro*, this court determines that the statements by Officer Smith and Lieutenant Laningham that "every inmate" participated in the riot constitute "some evidence" of Capo's guilt, consistent with the result in *Hill*. The "all-inclusive" statements about the conduct of a relatively small group of inmates in the G-block day room are not "blatantly implausible." To the contrary, they are consistent with the express recognition by the Zavaro court that all-inclusive statements could constitute "some evidence" in certain limited circumstances.

The requirements of due process are satisfied because some evidence supports the decision by the prison disciplinary board to revoke good time credits. *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985). This court is not required to examine the entire record,

to assess independently the credibility of witnesses, or to weigh the evidence. *Id.* at 455. Capo's prison disciplinary proceedings could be overturned only if there was no evidence to support the decision of the prison officials. *Reeves v. Pettcox,* 19 F.3d 1060, 1062 (5th Cir. 1994). The record defeats that argument. The record shows that the disciplinary hearing officer's decision was neither arbitrary and capricious nor an abuse of discretion. *Smith v. Rabalais,* 659 F.2d 539, 545 (1981). Capo's claims fail on federal habeas review.

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Christopher Village, L.P. v. Retsinas,* 190 F.3d 310, 314 (5th Cir. 1999). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The pleadings and prison records show that Capo's federal petition fails to state a ground for habeas relief.

Capo is not entitled to habeas relief on the claims he raises in this case.

## V. Conclusion

The respondent's motion for summary judgment, (Docket Entry No. 9), is granted. Capo's petition for a writ of habeas corpus is denied. This case is dismissed. Any remaining pending motions are denied as moot.

The Supreme Court has stated that the showing necessary for a Certificate of Appealability is a substantial showing of the denial of a constitutional right. *Hernandez v. Johnson,* 213 F.3d 243, 248 (5th Cir. 2000) (citing *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000)). Under that standard, an applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or

that the issues are suitable enough to deserve encouragement to proceed further. *See Clark v. Johnson,* 202 F.3d 760, 763 (5th Cir. 2000). When a district court has rejected a prisoner's constitutional claims on the merits, the applicant must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack,* 529 U.S. 484. This court denies Capo's petition after careful consideration of the merits of his constitutional claims. This court denies a Certificate of Appealability because Capo has not made the necessary showing for issuance.

SIGNED on June 5, 2011, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge